**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

TIMOTHY LETT,

        **Plaintiff,**

    **v.**                           **Civil Action 2:26-cv-4**

                                   **Magistrate Judge Kimberly A. Jolson**

UNITED ASSOCIATION OF
PLUMBERS AND STEAMFITTERS,
et al.,

        **Defendants.**

**<u>OPINION & ORDER</u>**

The United Association of Journeymen and Apprentices of the Plumbing and Pipefitting

Industry of the United States and Canada's ("UA") and the United Association of Journeymen and

Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada, Local 189's

("Local 189") Motions to Dismiss are before the Court. (Docs. 38, 39). The Court **GRANTS** the

Motions.

**I.    BACKGROUND**

This case, to which the parties consented to the jurisdiction of the Magistrate Judge under

28 U.S.C. § 636(c) (*see* Docs. 24, 25, 29), centers on Plaintiff Timothy Lett's union membership

rights. His *pro se* Second Amended Complaint alleges that UA and Local 189 violated the Labor-

Management Reporting and Disclosure Act ("LMRDA"), 29 U.S.C. § 411, and the Labor

Management Relations Act ("LMRA"), 29 U.S.C. § 185, following the suspension of his travel

card and employment dispatch rights in Local 189's jurisdiction. (*See generally* Doc. 36).

Plaintiff is a "journeyman pipefitter and a member in good standing of UA Local 398" and worked

as a traveling member within Local 189's jurisdiction during the relevant period. (*Id.* at ¶ 6). For

its part, Local 189 administers a hiring hall and refers union members for work. (*Id.* at ¶¶ 13–7).

According to exhibits attached to the Second Amended Complaint, Plaintiff had a conversation with Local 189 Business Manager Dan McHale on October 3, 2024.  (*Id.* at 57; *see also id.* at ¶¶ 15–16).  Local 189's by-laws state that the Business Manager position is one of several elected officers.  Business Managers "have a general supervisory control over all matters pertaining to the daily business of the Local Union." (Doc. 38-1 at 11–12, 14).  In Plaintiff's self-transcribed (and possibly edited) version of the exchange, he asked McHale about a "layoff paper" related to an employer secured through the hiring hall.  (Doc. 36 at 61–70).  After some heated back and forth, McHale told Plaintiff he was to be put on a "not to be dispatched [list] for 90 days" pursuant to McHale's own policy.  (*Id.* at 62 ("That's my policy.  You don't come in here making demands.  You don't request the layoff and then come in here and get another job.  Doesn't work that way.")).  Plaintiff alleges that McHale then "capriciously escalated Plaintiff's punishment from 90 days [on the not to be dispatched list], to 6 months, to 9 months[.]"  (*Id.* at ¶ 16; *see also id.* at 64).

Then on June 2, 2025, Plaintiff sought to resume working as a traveler in Local 189's jurisdiction after being "informal[ly] suspend[ed]" for the nine months.  (*Id.* at ¶ 13).  A little over one week later, a Business Agent from Plaintiff's home jurisdiction informed him that McHale "summarily removed Plaintiff from the out-of-work list and instituted an 'indefinite suspension.'" (*Id.* at ¶ 14; *see also id.* at ¶ 16).  Plaintiff asserts this "benching" was "direct, targeted retaliation for" him "inquir[ing] about his layoff status, his paperwork, and the dispatch procedures at the Local 189 hall." (*Id.* at ¶ 15).  Plaintiff claims these actions were "official union discipline" that were executed without formal written charges, notice, or a hearing.  (*Id.* at ¶ 18).

Plaintiff says that because Local 189 did not have an applicable grievance procedure in place, he submitted a formal written grievance to the UA's General President's office and the UA's General Executive Board on June 22 and 23 via email.  (*Id.* at ¶¶ 19–20; *see also id.* at 35–38).

2

Plaintiff alleges the email triggered a mandatory duty for UA to act on his grievance. (*Id.* at ¶ 21). On June 26, an administrative assistant informed Plaintiff that the General President referred the complaint to him for review. (*Id.* at ¶ 22; *see also id.* at 40). Then on August 25, the same administrative assistant responded to another email from Plaintiff, said UA was actively investigating issues raised in his grievance, and informed him the office would follow up as soon as practicable. (*Id.* at ¶ 23; *see also id.* at 42–47). Plaintiff takes issue with this response, calling it "hostil[e]" because it classified some of Plaintiff's statements as "threats." (*Id.* at ¶ 24; *see also id.* at 43 ("Failure to comply will result in immediate escalation to the UA General President, Executive Board, and, if still unresolved, external and public accountability channels."), 47 ("[W]e will follow up with you as soon as is practicable based on what the investigation reveals . . . and without regard to the threats set forth in your email.")). Additionally, Plaintiff contends UA "abandoned its active investigation" and never held a hearing, issued a final decision, or otherwise intervened on Plaintiff's behalf. (*Id.* at ¶ 25). Still, on September 22, McHale issued a clearance letter that lifted Plaintiff's work ban and allowed him to return to work in Local 189's jurisdiction. (*Id.* at ¶ 28; *see also id.* at 85 (clearance letter signed by McHale)).

For all this, Plaintiff asserts related causes of action. He alleges Local 189 violated the LMRDA by (1) "systematically blacklisting and benching Plaintiff" in retaliation for his protected speech; and (2) "unilaterally and indefinitely suspending [Plaintiff's] dispatch and travel card rights without providing any of the statutorily required due process protections." (*Id.* at ¶¶ 39–47 (citing 29 U.S.C. § 411(a)(2), (5))). Plus, he contends UA acted contrary to the LMRDA by "ratifying" Local 189's LMRDA violations. (*Id.* at ¶¶ 48–53). He also claims UA engaged in a breach of contract in violation of the LMRA when it failed to take actions in response to Plaintiff's grievances that were mandatory under UA's constitution. (*Id.* at ¶¶ 32–38). Plaintiff asks for declaratory and injunctive relief, back and front pay, restitution, attorney's fees, and compensatory and punitive damages. (*Id.* at 11–12).

Both Defendants filed Motions to Dismiss Plaintiff's Second Amended Complaint (Docs.

38, 39).  The Motions are ready for consideration.  (Docs. 41, 42, 43, 44).

II.     **STANDARD**

Three principles matter here.  Rule 12(b)(6) of the Federal Rules of Civil Procedure requires that a complaint "state a claim to relief that is plausible on its face" to survive a motion to dismiss.  *Ashcroft v. Iqbal*, 556 U.S. 662, 663–64, 678 (2009); *Bell Atl. Corp v. Twombly*, 550 U.S. 544, 570 (2007).  In reviewing the complaint, a court must construe it in favor of the plaintiff and accept all well-pleaded factual allegations as true.  *Id.* at 570.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).  On the other hand, a complaint that consists of "labels and conclusions" or "a formulaic recitation of the elements of a cause of action" is insufficient.  *Twombly*, 550 U.S. at 555; *see also Brown v. Matauszak*, 415 F. App'x 608, 613 (6th Cir. 2011) (noting that a plaintiff must give specific, well-pleaded facts, not just conclusory allegations).  In other words, while "detailed factual allegations" are not required under Fed. R. Civ. P. 8(a)(2)'s "short and plain statement" rule, the law "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Iqbal*, 556 U.S. at 677–78 (quotation marks and citations omitted).

While the Court holds pleadings by *pro se* individuals "to less stringent standards than formal pleadings drafted by lawyers," the complaint must still "contain either direct or inferential allegations respecting all the material elements" of a plaintiff's claims to survive a motion to dismiss.  *Barhite v. Caruso*, 377 F. App'x 508, 510 (6th Cir. 2010) (internal quotations omitted).  Said differently, although courts construe *pro se* complaints liberally, *Haines v. Kerner*, 404 U.S. 519, 520 (1972), they still require "basic pleading essentials," *Wells v. Brown*, 891 F.2d 591, 594 (6th Cir. 1989).

The Court's review of a Rule 12 motion is typically limited to the pleadings.  *Bates v.*

*Green Farms Condo. Ass'n*, 958 F.3d 470, 483 (6th Cir. 2020).  But the Court may also consider written instruments attached to the pleadings, like contracts between parties.  *See Smith v. City of Barberton*, No. 1:20-cv-584, 2021 WL 752595, at *3 (N.D. Ohio Feb. 26, 2021).  Similarly, the Court may additionally consider documents or instruments referred to in the complaint that are central to a plaintiff's claim.  *See Blesedell v. Chillicothe Tel. Co.*, No. 2:13-CV-451, 2013 WL 6096329, at *2 (S.D. Ohio Nov. 19, 2013) (citing Fed R. Civ. P. 10(c)).  UA attached a copy of its constitution as an exhibit to its motion to dismiss. (Doc. 39-2).  Plaintiff refers to UA's constitution in his Second Amended Complaint, and it is central to Plaintiff's breach of contract claim.  (*See* Doc. 36 at ¶¶ 32–38).  Therefore, the Court may consider UA's constitution in ruling on the motions to dismiss.  Additionally, Local 189 filed its by-laws as an exhibit to its motion to dismiss. (Doc. 38-1).  Again, Plaintiff refers to the by-laws in his Second Amended Complaint, and he attaches one page of them to his own pleading to support his allegation that Local 189 did not provide a proper grievance procedure.  (*See* Doc. 36 at ¶ 19; *see also id.* at 33).  For these reason, the Court may consider Local 189's by-laws as well.

## III.   DISCUSSION

Both Local 189 and UA argue Plaintiff's Second Amended Complaint should be wholly dismissed because it fails to state a claim upon which relief may be granted.  The Court agrees.

### A.   Local 189's Motion to Dismiss

"Title I of the LMRDA and specifically section 101, 29 U.S.C. § 411, is the 'Bill of Rights' for union members."  *Tucker v. Bieber*, 900 F.2d 973, 977 (6th Cir. 1990) (citation omitted).  Plaintiff claims Local 189 violated two of those rights: his right to free speech and his right to due process.  (*See generally* Doc. 36).  Local 189 argues he does not successfully state a claim for either. (Docs. 38, 43).  The Court considers each argument in turn.

#### 1.    *LMRDA Free Speech Claim*

5

Plaintiff claims that Local 189 violated his free speech rights protected by the LMRDA when Local 189 "systematically blacklist[ed] and bench[ed]" him following his questions about his employment status.  (Doc. 36 at ¶¶ 39–42).  In relevant part, Section 101(a)(2) of the LMRDA provides:

> [e]very member of any labor organization shall have the right to meet and assemble freely with other members; and to express any views, arguments, or opinions; and to express at meetings of the labor organization his views, upon candidates in an election of the labor organization or upon any business properly before the meeting, subject to the organization's established and reasonable rules pertaining to the conduct of meetings[.]

29 U.S.C. § 411(a)(2).  The Sixth Circuit has explained that "[t]his statute contains three clauses: freedom of assembly; freedom 'to express any views, arguments, or opinions'; and freedom to express at meetings views upon election candidates and issues."  *Barger v. United Bhd. of Carpenters & Joiners of Am.*, 3 F.4th 254, 264 (6th Cir. 2021).  Because Plaintiff does not link his free speech claim to assembly or a union meeting, the second of these is relevant.  *See id.*; (Doc. 36 at ¶¶ 15, 41).  To establish a free speech claim under Section 101(a)(2), a plaintiff must prove "(1) his conduct was protected by the LMRDA; (2) the defendant took actions against him in substantial part because of this exercise of his rights under the LMRDA; and (3) he was damaged and suffered an injury, as a proximate result of the actions of the defendant."  *Barger*, 3 F.4th at 264 (citation omitted).

The Supreme Court has noted that "Congress adopted the freedom of speech and assembly provision [of Section 101(a)(2)] in order to promote union democracy."  *United Steelworkers of Am. v. Sadlowski*, 457 U.S. 102, 112 (1982).  Following this guidance, the Sixth Circuit has cabined Section 101(a)(2)'s free speech right to cover "speech that implicates union democracy, including speech related to union policies and criticism of union leadership."  *Barger*, 3 F.4th at 264 (citing *United Food & Com. Workers Int'l Union Local 911 v. United Food & Commercial Workers Int'l*

6

*Union*, 301 F.3d 468, 474–75 (6th Cir. 2002)) (emphasis omitted); *see also Kazolias v. IBEWLU 363*, 806 F.3d 45, 52 (2d Cir. 2015) ("Title I's protections are limited to speech of significant concern to the union membership as a whole."); *Hylla v. Transp. Commc'ns Int'l Union*, 536 F.3d 911, 917 (8th Cir. 2008) ("§ 101(a)(2) protection is limited to speech that relates to the general interests of the union membership at large."); *Teamsters Loc. Union No. 2000 v. Hoffa*, 284 F. Supp. 2d 684, 695 (E.D. Mich. 2003) ("[T]he Supreme Court has consistently [i]dentified the primary purpose of § 101(a)(2) to be 'assuring rank-and-file members' democratic participation in intra-union affairs, such as voting in union elections, standing for union office, and approving (or challenging) official union policies and decisions.'") (citation omitted). Additionally, "[t]his circuit's caselaw on the second LMRDA § 101(a)(2) clause establishes a tight nexus between LMRDA claims and First Amendment principles and tests." *Barger*, 3 F.4th at 265 (citation omitted). In applying those principles, the Sixth Circuit instructs that "identifying 'matters of union concerns' enables courts to identify issues that 'implicate union democracy.'" *Id.* (citation omitted). To aid in that identification, courts look to the speech's content, form, and context. *Id.* at 266.

Here, Plaintiff alleges little about the content, form, or context of the speech at issue. His claim centers on his inquiries to McHale about "his layoff status, his paperwork, and the dispatch procedures at the Local 189 hall." (Doc. 36 at ¶ 15; *see also id.* at ¶ 16 (alleging video footage would show Plaintiff "respectfully asking questions about his employment status")). Later, Plaintiff reiterates that he "exercise[d] his protected speech to respectfully inquire about his employment and layoff status at the union hall." (*Id.* at ¶ 41). Even considering Plaintiff's brief description, the Court agrees with Local 189's argument that Plaintiff's Second Amended Complaint fails to allege that Local 189 retaliated against him for engaging in conduct protected

7

by the LMRDA. In particular, Plaintiff's allegations do not describe speech that touched on matters of union concern or implicated union democracy. As told by him, the content of his speech did not relate to union policies or criticize union leadership. *See Barger*, 3 F.4th at 264. And considering the context and form of the speech, Plaintiff alleges that his discussion with McHale happened during a one-on-one meeting at the union hall following questions about his employment status. (Doc. 36 at ¶¶ 15–16). Though Plaintiff need not have spoken to McHale at a union meeting for his speech to be protected, *see Barger*, 3 F.4th at 269–71, he has not alleged he voiced his concerns in a member-based format. This "adds to the impression that [he] was not speaking on a matter of concern" to Local 189's membership, *Trail v. Loc. 2850 UAW United Def. Workers of Am.*, 710 F.3d 541, 549 (4th Cir. 2013). What's more, Plaintiff's comment that he talked to McHale about unspecified "dispatch procedures at the Local 189 hall," (Doc. 36 at ¶ 15) is simply too vague for the Court to plausibly infer he spoke to matters of union concern. And even taking Plaintiff's self-transcribed conversation with McHale as true, the conversation revolved around Plaintiff's own layoff paperwork and McHale's policies as they applied to Plaintiff. (*See id.* at 61–70); *cf. Murphy v. Int'l Union of Operating Eng'rs, Loc. 18*, 774 F.2d 114 (6th Cir. 1985) (finding a union's manipulation of its hiring hall referrals can constitute a violation of the LMRDA's free speech provisions where the manipulation was done to "suppress [the plaintiff's] participation in Union activities" following the plaintiff engaging in dissident speech).

Plaintiff counters that his alleged speech implicates union concern because he "challeng[ed] the arbitrary and unwritten rules of a local official who unilaterally controls the economic survival of union members." (Doc. 42 at 4). Plaintiff says that is "a matter of profound concern to the entire union membership." (*Id.* ("A local official secretly instituting unwritten 'personal policies' to bypass constitutional due process and extract quid pro quo arrangements

8

strikes at the very heart of union democracy.")). But as Local 189 contends, what matters here is the content, form, and context of the speech actually alleged in Plaintiff's Second Amended Complaint. Plaintiff alleged that he questioned McHale about "*his* paperwork" and "*his* employment and layoff status at the union hall." (Doc. 36 at ¶¶ 15, 16, 41 (emphasis added)). In other words, the Second Amended Complaint alleges the content of his speech was limited to issues about himself. *Cf. Barger*, 3 F.4th at 268 ("Whether an employee's statement is predominated by 'the employee's personal interest *qua* employee' is primarily a content-based inquiry . . . the distinction [is] between matters of public concern and matters only of personal interest, not civic-minded motives and self-serving motives." (citation modified)) (quoting *Chappel v. Montgomery Cnty. Fire Prot. Dist. No. 1*, 131 F.3d 564, 575 (6th Cir. 1997)).

Other courts have concluded comparable speech related to personal interests are not protected by the LMRDA's free speech provision. Similar to the Sixth Circuit, the Second Circuit reads Section 101(a)(2) to protect "speech that concerns union governance and union affairs." *Kazolias*, 806 F.3d at 51; *see also Barger*, 3 F.4th at 266 (relying on *Kazolias* in discussing the LMRDA's free speech protections). In *Kazolias*, union members alleged that their union denied them job referrals in retaliation for filing safety-related grievances and complaints with federal agencies. *Kazolias*, 806 F.3d at 51. The court noted that while "the administration of a union's hiring hall is a subject of vital interest to the full membership [of the union]," not "every personal grievance premised on an allegation of an inappropriate job referral necessarily qualifies as protected speech under Title I." *Id.* In particular, the plaintiffs' complaints "sought only redress for their personal grievances" and "sought only individualized personal relief." *Id.* The court ultimately affirmed dismissal of the retaliation claim, noting that "the more the speech is limited to asserting a personal grievance of the plaintiff and the more it seeks merely personal relief for

the plaintiff, as opposed to advocacy for changes that would affect the membership as a whole, the less likely that the particular speech comes within the scope of protection of Title I." *Id.*

So too here. Plaintiff alleges speech seeking redress only for personal grievances and only individualized relief related to his paperwork, his layoff status, and his dispatch rights. (*See* Doc. 36 at ¶¶ 15, 41). While statements about union hiring halls may at times implicate matters of union concern, Plaintiff's self-described statements are best categorized as "personal grievances about the way he was being treated." *Hylla*, 536 F.3d at 919 (finding a member's speech in response to being "singled out" by a chairman's workplace attendance record keeping was "a concern about his unique situation"); *cf. Barger*, 3 F.4th at 264 (finding a union member's speech related to his employer overbilling a client and falsifying hours was of union concern because his speech criticized union leadership and policies, implicated union democracy, and addressed an abuse of power).

Taken together, the Court concludes that Plaintiff has not plausibly alleged that his conduct was protected by the LMRDA. For this reason, Plaintiff's Section 101(a)(2) claim against Local 189 is **DISMISSED**.

### 2. *LMRDA Due Process Claim*

Plaintiff additionally claims that Local 189 violated his rights protected under the LMRDA by disciplining him without due process. (Doc. 36 at ¶¶ 43–47). Specifically, he alleges that Local 189 should have issued written charges and held a formal hearing prior to the "indefinite suspension of his travel card and employment dispatch rights." (*Id.* at ¶¶ 1, 18, 46). Plaintiff invokes Section 101(a)(5) of the LMRDA, which states:

> No member of any labor organization may be fined, suspended, expelled, or otherwise disciplined except for nonpayment of dues by such organization or by any officer thereof unless such member has been (A) served with written specific charges; (B) given a reasonable time to prepare his defense; (C) afforded a full and fair hearing.

29 U.S.C. § 411(a)(5).  Because Plaintiff does not allege Local 189 fined, suspended, or expelled him, the sufficiency of Plaintiff's pleading turns on whether he alleges he was "otherwise disciplined" by Local 189.

"Discipline" in the context of Section 101(a)(5) does not have an expansive definition.  To the contrary, the Supreme Court has explained that "otherwise disciplined" denotes "only punishment authorized by the union as a collective entity to enforce its rules." *Breininger v. Sheet Metal Workers Int'l Ass'n Loc. Union No. 6*, 493 U.S. 67, 91 (1989).  Said another way, the "term refers to actions 'undertaken under color of the union's right to control the member's conduct in order to protect the interests of the union or its membership.'"  *Id.* (citation omitted).  Such discipline includes "punishments typically imposed by the union as an entity through established procedures meant to signify penalties applied by the union in its official capacity, 'rather than *ad hoc* retaliation by individual union officers.'"  *Webster v. United Auto Workers, Loc. 51*, 394 F.3d 436, 441(6th Cir. 2005) (quoting *Breininger*, 493 U.S. at 92).

To plead that Local 189 owed him written charges and a hearing, Plaintiff must assert that the "indefinite suspension of his travel card and employment dispatch rights" was punishment authorized by Local 189, as a collective entity, to enforce its rules.  The Court agrees with Local 189 that Plaintiff's Second Amended Complaint stops short of this.  Rather, he alleges that the temporary suspension of his travel card and employment dispatch rights were imposed on him by Business Manager McHale.  (Doc. 36 at ¶¶ 14–16).  Plaintiff admits that McHale "referred to his retaliatory actions as a 'personal policy.'"  (*Id.* at ¶ 17; *see also id.* at 62).  He states McHale "executed . . . [the] discipline unilaterally."  (*Id.* at ¶ 18).  Then, McHale signed the letter informing Plaintiff he no longer had restrictions on his referral rights.  (*Id.* at 85).  Even construed in his favor, it is difficult to understand this portion of the Second Amended Complaint as anything but

an allegation of *ad hoc* retaliation by McHale.  More importantly, Plaintiff does not allege that the discipline "result[ed] from an established union disciplinary process," or that Local 189 as an entity took action against him.  *Webster*, 394 F.3d at 441 (finding significant that discipline was not a connected to an established union disciplinary process); *see also Breininger*, 493 U.S. at 94 ("[P]etitioner alleged only that the union business manager and business agent failed to refer him for employment . . . . The opprobrium of the union *as an entity* . . . was not visited upon petitioner. He was not punished by any tribunal, nor was he the subject of any proceedings convened by respondent."); *cf. Murphy*, 774 F.2d at 121–22 (affirming the district court's finding that though manipulating a referral system was "economic discrimination" in violation of the plaintiff's rights under the LMRDA, it was not discipline within the meaning of Section 101(a)(5)).  Further, this Court has found similar allegations of "informal economic reprisal" insufficient to state a claim under the LMRDA.  *Cf. West v. Carpenters' Loc. Union No. 136*, No. 1:13-CV-99-HJW, 2014 WL 1382301, at *4 (S.D. Ohio Apr. 8, 2014) (finding no cognizable claim under 29 U.S.C. § 529—which prohibits a labor organization from "otherwise disciplin[ing]" its members for exercising rights secured by the LMRDA—where the plaintiffs alleged they were not being referred work through the union hiring hall by agents and officers in retaliation for expressing views about union policies).

Still, Plaintiff asserts that because he alleged McHale is a Local 189 "top official," used "official institutional authority [and] administrative systems" to enforce the suspension, and lifted Plaintiff's suspension via a "formal" clearance letter, McHale's actions are best understood as collective union action.  (*See id.*; *see also* Doc. 42 at 3–4; Doc. 36 at 85 (clearance letter)).  But the gravamen of the "other discipline" inquiry is process—not authority.  Plaintiff alleges no indicia of any Local 189 process at play in his "benching."  He alleges only that McHale classified

12

his actions as taken pursuant to a "personal policy," that McHale took action "unilaterally," and that when his referral rights restrictions were lifted, McHale signed the clearance letter. (Doc. 36 at ¶¶ 14–18; *id.* at 62, 85). The Second Amended Complaint does not assert the involvement of any other Local 189 player or body.

Simply put, because Plaintiff has not alleged "discipline" within the meaning of Section 101(a)(5), he has not plausibly stated a claim that Local 189 deprived him of his due process rights protected by the same. Plaintiff's Section 101(a)(5) claim against Local 189 is **DISMISSED**.

### B. UA's Motion to Dismiss

UA also moves to dismiss Plaintiff's claims, arguing he does not successfully state either that UA ratified the unlawful conduct of Local 189 or that UA's actions in response to his emailed grievance breached its constitution. (Doc. 39). The Court is persuaded on both counts.

### 1. Ratification Claim

Plaintiff claims that UA is liable under the LMRDA for ratifying the unlawful conduct of Local 189. (Doc. 36 at ¶¶ 48–53). He alleges that UA "officially ratified and became complicit in Local 189's LMRDA Free Speech and Due Process Violations" because Plaintiff notified UA of his dispatch rights suspension; UA responded that it was investigating the matter; but UA did not remedy the situation. (*Id.* at ¶ 52). Up front, because the Court found Plaintiff fails to successfully plead that Local 189 violated either his free speech or due process rights under the LMRDA, Plaintiff's claim that UA ratified the alleged unlawful conduct naturally falls as well. Even if that is not true, the claim fails because Plaintiff has not plausibly alleged that UA authorized or ratified any misconduct by Local 189 or its officers.

The Sixth Circuit limits an international union's liability for actions taken by local unions to "situation[s] involving common law agency" where the international "authoriz[es] or ratif[ies]" the actions of the local. *Mauget v. Kaiser Eng'r, Inc.*, No. C-1-78-768, 1980 WL 18724, at *3 (S.D. Ohio Oct. 20, 1980) (discussing "this Circuit's long line of cases refusing to hold

13

international unions vicariously liable to employers without a showing of authorization or ratification") (collecting cases); *Shimman v. Frank*, 625 F.2d 80, 95, 97 (6th Cir. 1980) ("The fact that an officer of the local union may have transgressed does not mean that the International is liable . . . . The acts of the local and its agents cannot automatically be imputed to the International."), *overruled on other grounds sub nom. Shimman v. Int'l Union of Operating Eng'rs, Loc. 18*, 744 F.2d 1226 (6th Cir. 1984); *see also Carbon Fuel Co. v. United Mine Workers of Am.*, 444 U.S. 212, 216–17 (1979) (explaining Congress' "reason for adopting the common-law agency test, and applying to unions the common-law doctrine of respondeat superior" in Section 301 of the LMRA). Said another way, there is no inherent agency relationship between UA and Local 189. To allege an agency relationship, Plaintiff must offer facts that allow the Court to plausibly infer that UA "instigated, supported, ratified, or encouraged" Local 189's alleged misconduct. *Carbon Fuel Co.*, 444 U.S. at 218 (citation omitted).

Plaintiff asserts several theories of liability in this respect. He first alleges liability because Plaintiff "formally notified" UA of the suspension of his dispatch rights, but UA did not "lift the unlawful benching." (Doc. 36 at ¶ 50). He also says UA was "complicit" in Local 189's misconduct because UA "stall[ed]" its investigation of Plaintiff's grievance; "knowingly allow[ed] Plaintiff to suffer ongoing . . . economic deprivation"; and "demonstrated profound hostility" towards him. (*Id.* at ¶¶ 50–52).

In essence, Plaintiff alleges that because UA did not act—or did not act quickly or politely—it ratified Local 189's actions. Courts repeatedly have found an international union's failure to respond to actions taken by an affiliated local union alone does not meet the bar for ratification. *See, e.g.*, *Shimman*, 625 F.2d at 99 (rejecting the plaintiff's argument that the international union is vicariously liable "for mere inaction on the part of its officers"); *Buckeye Power, Inc. v. Util. Workers Union of Am.*, 607 F.2d 759, 762–64 (6th Cir. 1979) (affirming a finding that a national union was not liable for the actions of the local union when it took "no positive actions" itself which violated the law); *see also Carbon Fuel Co.*, 444 U.S. 212, 217–18

14

(saying it would be "anomalous" to hold an international union liable for its "failure to take certain steps in response to actions of the local" when considering Congress' intent in Section 301 of the LMRA to limit an "international union's legal responsibility for the acts of one of its local unions"); *Brenner v. Loc. 514, United Bhd. of Carpenters & Joiners of Am.*, 927 F.2d 1283, 1289 (3d Cir. 1991) ("Mere constructive knowledge of possible illegal activity on the local level is not sufficient to impose a legal duty to intervene on the International Union."); *Rodonich v. House Wreckers Union Loc. 95 of Laborers' Int'l Union*, 817 F.2d 967, 974–75 (2d Cir. 1987) (upholding a jury instruction stating "The International has no affirmative obligation to act to correct the unlawful acts of its affiliated local union . . . even though . . . the International, may have had knowledge of those unlawful acts.").

In fact, this Court has dismissed a claim of ratification where the plaintiff merely alleged—similar to here—that an international union failed to respond to "charges, complaints, and appeals" about a local union's defective referral system. *Small v. Int'l Bhd. of Elec. Workers*, 626 F. Supp. 96, 99 (S.D. Ohio 1985) ("[A]ll that is alleged is that the International failed to respond to grievances and complaints filed with it. We decline to impose vicarious liability on the International merely because it failed to act."); *cf. also Barger v. United Bhd. of Carpenters & Joiners of Am.*, No. 1:17-CV-77, 2018 WL 1561871, at *5 (S.D. Ohio Mar. 30, 2018) ("The Court agrees with the Union that its failure to act on [the plaintiff's] appeal (*i.e.*, delayed ruling) and ultimate *granting* of his appeal does *not* support ratification." (emphasis in original)). The same is true even when the international union conducts investigations in response to complaints about a local union's actions. *See, e.g.*, *Brenner*, 927 F.2d at 1289 (finding an international union did not authorize or ratify the action of its affiliated local union when it conducted investigations "on the two occasions when it received letters written for the specific purpose of protesting hiring hall abuses"); *Clark v. Teamsters Loc. Union 651*, 349 F. Supp. 3d 605, 618–19 (E.D. Ky. 2018) (finding an international union's failure to remedy a local union's "internal issues" after receiving a letter detailing the problems and appointing someone to investigate the claims did not constitute

15

ratification).  And an international union does not otherwise have a "duty to intervene in the affairs of its subordinate bodies, even if the subordinate body is allegedly engaging in wrongdoing." *Cloke v. Adams*, No. 1:09-CV-660, 2010 WL 3075183, at *3 (S.D. Ohio May 27, 2010), *report and recommendation adopted*, No. 1:09-CV-660, 2010 WL 3075180 (S.D. Ohio Aug. 4, 2010).

Here, Plaintiff's ratification claim relies on his allegations that he emailed a grievance to the UA's General President; the office acknowledged receipt of the email, referred the grievance for review, and stated it was investigating the complaint; but UA did not complete the investigation, resolve Plaintiff's complaint, or direct Local 189 lift his dispatch restrictions.  (Doc. 36 at ¶¶ 20–23, 25, 50–52; *see also id.* at 35–55).  Even accepting this as true, the law is clear that UA's alleged activities are not ratification because, at base, Plaintiff alleges no more than UA's failure to act or intervene on his behalf.

For these reasons, even if Plaintiff has successfully pleaded LMRDA claims against Local 189—which he has not—he has not stated a claim that UA is liable for any misconduct on the part of Local 189.  Plaintiff's claim alleging UA violated his LMRDA rights via ratification is **DISMISSED**.

### 2. *Breach of Contract Claim*

Finally, Plaintiff's Second Amended Complaint alleges that UA breached its own constitution when it disregarded mandatory duties to "take appropriate action and render a decision regarding Plaintiff's formally submitted grievance."  (Doc. 36 at ¶ 35).  Specifically, Plaintiff alleges the breach occurred when UA initiated an active investigation into his grievance but then abandoned it, failed to issue a ruling, and acted with "documented hostility."  (*Id.* at ¶ 36).  UA argues that Plaintiff fails to state a breach of contract claim because the provisions he relies on do not create a duty under which UA must respond to Plaintiff's grievance.  (Doc. 39-1 at 5–10).  The Court agrees with UA.

To begin, a breach of an international union constitution can violate Section 301 of the LMRA.  *See, e.g.*, *Wooddell v. Int'l Bhd. of Elec. Workers, Loc. 71*, 502 U.S. 93, 94 (1991) ("The

16

subject-matter jurisdiction conferred on the district courts by § 301(a) extends to suits on union constitutions brought by individual union members."); *Angel v. United Paperworkers Int'l Union Loc. 1967*, No. C-1-01-467, 2003 WL 21910753, at *7 (S.D. Ohio Mar. 10, 2003) ("Individual union members may bring suit against their union under § 301 for breach of the union constitution because the union constitution is considered to be a contract between labor organizations, and, the individual members of the union are considered to be third-party beneficiaries of that contract."). Still, a plaintiff "can only advance a claim of breach of written contract by identifying and presenting the actual terms of the contract allegedly breached." *Harris v. Am. Postal Workers Union*, 198 F.3d 245, at *3 (Table) (6th Cir. 1999); *see also Foster v. Health Recovery Servs., Inc.*, 493 F. Supp. 3d 622, 640 (S.D. Ohio 2020) ("The Sixth Circuit does not permit a party to allege, in a cursory manner, the existence of a contract without pointing to specific language that was allegedly breached."). Plaintiff's Second Amended Complaint identifies UA constitution Sections 220(e), 204(a), and 207(d) as the pertinent provisions. (Doc. 36 at ¶¶ 21, 30, 35). The Court considers each in turn.

First, Section 220(e) of UA's constitution contemplates travel cards for building and construction trades journeymen. (Doc. 39-2 at 140). It reads:

> Should any question arise as to the legality or validity of the issuance or acceptance of the travel card, the officer or agent of the Local Union issuing or accepting the travel card shall give immediate notice to the General President, who shall take appropriate action to adjust or decide the question so raised. The decision of the General President shall be final and binding, and there shall be no appeal from the decision of the General President to the General Executive Board.

(*Id.* at 143). Plaintiff alleges that when he sent an email to the UA General President's office in June 2025 with a grievance letter attached, the General President's "mandatory dut[y]" to "take appropriate action" under this provision was triggered. (Doc. 36 at ¶ 21). A plain read of Section 220(e) reveals that the General President has a duty to take the contemplated actions only when a "question arise[s] as to the legality or validity of the issuance or acceptance of [a] travel card" and an "officer or agent of the Local Union issuing or accepting the travel card" gives notice to the

17

General President.  (Doc. 39-2 at 143).  Plaintiff does not allege that he is an officer or an agent of a Local Union.  (*See* Doc. 36 at ¶ 6 ("Plaintiff . . . is a journeyman pipefitter and a member in good standing of UA Local 398.")).  Even if he did, Plaintiff's grievance letter does not concern the legality or validity of the issuance or acceptance of a travel card.  Rather, Plaintiff's letter discusses that while he was working under a travel card in Local 189, he was "denied dispatch" and "removed from the out-of-work list." (*Id.* at 35).  Taken as a whole, Plaintiff's Second Amended Complaint does not contain facts which, even when viewed in his favor, plausibly allege that UA violated Section 220(e) of its constitution.

Next, Section 204(a) discusses original jurisdiction of UA's General Executive Board to try offenses against the International Union.  (Doc. 39-2 at 130).  It states:

> When any offense is committed against the International Union or its officers including, but not limited to, a violation of the provisions of this Constitution or the policies or decisions of the International Union or any officer thereof, written charges may be filed against any accused members, officers, Local Unions, District Councils, State or Provincial Associations or other affiliated body and the General Executive Board shall have original jurisdiction to conduct the trial on such charges.

(*Id.*).  Plaintiff again alleges this provision imposes on UA a "mandatory duty" to "take appropriate action and render a decision regarding Plaintiff's formally submitted grievance." (Doc. 36 at ¶ 35).  The text shows otherwise.  Nothing in Section 204(a) describes a mandatory duty.  When an offense is committed against the International Union or its officers, written charges "may" be filed—not "must" be filed.  (Doc. 39-2 at 130).  Said another way, charges are discretionary.  Still more, Plaintiff does not allege that an offense was committed against the International Union or its officers.  Rather, Plaintiff describes how he—a member—was personally wronged by Local 189.  (*See generally* Doc. 36).  His contention that Local 189's alleged actions implicate the UA's "foundational disciplinary rules" and federal law does not transmute this plain read.  (Doc. 41 at 3).  Simply put, Plaintiff has not plausibly alleged a violation of Section 204(a).

Section 207(d), which concerns appeals to the General Executive Board, does not help Plaintiff either. (Doc. 39-2 at 133). It says:

> A member who is assessed or fined $1,500.00 or less by the Local Union (other than suspension or expulsion) may appeal to the General Executive Board provided such appeal is filed within twenty (20) days of notice to the accused of the Local Union Executive Board's decision. A member shall file his appeal in writing, setting forth the grounds and reasons why the fine or other action of the Local Union should be reversed, modified or disallowed.

(*Id.*). Once more, Plaintiff's Second Amended Complaint alleges UA violated this provision by not taking action or rendering a decision on his grievance. (Doc. 36 at ¶ 35). But Plaintiff does not allege he was assessed or fined $1,500.00 or less by Local 189. (*See generally id.*). Therefore, the plain text of Section 207(d) does not apply. Even more, nothing in Section 207(d) imposes a mandatory duty on UA as Plaintiff alleges. It follows that Plaintiff's claim under this provision likewise fails.

Against this reality, Plaintiff confusingly asserts that that Court should not "cherry-pick" the very provisions he identified in his Second Amended Complaint, and he argues the Court should instead consider that UA violated other provisions or the constitution as a whole. (Doc. 41 at 2). Yet, the law is clear that a plaintiff cannot "ask the court to consider new allegations (or evidence) not contained in the complaint." *Bates v. Green Farms Condo. Ass'n*, 958 F.3d 470, 483–84 (6th Cir. 2020) (collecting cases). At any rate, the new provisions Plaintiff asks the Court to consider also do not impose a duty on UA relevant to his allegations. (*See* Doc. 39-2 at 36 (Section 46(f) of the UA constitution explaining that the General President is empowered to render decisions and adjust disputes among affiliates of UA), 67–68 (Section 92(a) of the UA constitution providing that if the General President receives information that Local Union officers are dishonest or incompetent, he may appoint a trustee to take charge of the affairs of the Local Union), 129–30 (Section 203 of the US constitution providing the General President may appoint a hearing officer

19

to act in place of the Local Union Executive Board following a finding of the Board's disqualification)).

And Plaintiff cannot rely on obligations allegedly created by UA's constitution generally without identifying specific sections or explicit language that applies. *Cf. Kunz v. United Food & Com. Workers, Loc. 876*, 5 F.3d 1006, 1010 n.2 (6th Cir. 1993) (rejecting a plaintiff's breach of contract argument that a union constitution created a just cause standard for termination when she failed "to identify any specific sections in the constitution or by-laws of the union that explicitly provide for just cause termination"); *Brenner*, 927 F.2d at 1292 ("If the unions and their members wish to impose a contractual duty on the International to intervene and take action in each instance where members charge that a local union has failed to abide by its duty of fair representation, the union's constitution must state such an obligation in . . . explicit language[.]"); *see also Shimman*, 625 F.2d at 99 (rejecting an argument that an international union "was under a duty to oversee and correct the anti-dissident abuses which were going on within" the local union based on the "alleged general duties" found in its constitution).

Ultimately, none of the constitutional provisions Plaintiff alleges UA breached obligated UA to take actions in response to his June 2025 grievance letter. While they may empower UA to act in certain situations, Sections 220(e), 204(a), and 207(d) do not, on their face, compel UA to complete an investigation, hold a hearing, issue a ruling, pursue a grievance within a certain amount of time, or otherwise intervene under the circumstances alleged by Plaintiff. As a result, the Court **DISMISSES** Plaintiff's breach of contract claim.

## IV.   CONCLUSION

For the foregoing reasons, the Court **GRANTS** both Local 189's Motion to Dismiss (Doc. 38) and UA's Motion to Dismiss (Doc 39). Plaintiff's claims against Local 189 and UA are all **DISMISSED**.

20

The Clerk is **DIRECTED** to enter judgment in favor of Defendants and close this case.

IT IS SO ORDERED.


Date:   June 15, 2026                                    /s/ Kimberly A. Jolson
                                                        KIMBERLY A. JOLSON
                                                        UNITED STATES MAGISTRATE JUDGE